# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# 3:16-cv-00653-RJC

| | |
|---|---|
| **FELICIA A. UNDERDUE,** | )<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>)  **ORDER** |
| | ) |
| **WELLS FARGO BANK, N.A.,** | )<br>) |
| Defendant. | )<br>) |

**THIS MATTER** comes before the Court on Defendant's Motion for Summary Judgment, (DE 89); Defendant's Memorandum in Support, (DE 90); Plaintiff's Pro Se Response in Opposition, (DE 91); Defendant's Reply, (DE 93); Plaintiff's Pro Se Motion for Continuance of Discovery, (DE 95); Defendant's Response in Opposition, (DE 98); and Plaintiff's Pro Se Motion to Continue Trial, (DE 99).

The Court has reviewed the pleadings, exhibits thereto, and applicable law. For the reasons stated herein, Defendant's Motion for Summary Judgment, (DE 89), is **GRANTED**, Plaintiff's Motion for Continuance of Discovery, (DE 95), is **DENIED as moot**, and Plaintiff's Motion to Continue Trial, (DE 99), is **DENIED as moot**.

## I. BACKGROUND

### A. Procedural Background

Plaintiff Felicia Underdue filed a Pro Se Complaint against Defendant Wells Fargo Bank, N.A. on September 7, 2016, alleging claims under Title VII and the Americans with Disabilities Act ("ADA"). (DE 1). This Court then granted Plaintiff's in forma pauperis request. (DE 4). In the intervening years, several iterations of amended complaints, answers, and a motion to dismiss

were filed. (DE 37 at 1-2). On September 27, 2019, this Court Ordered (i) that the July 27, 2017 Pro Se Amended Complaint, (DE 27), is the operative Complaint, (ii) that counts I and II in the Complaint remain while counts III, IV, V, and the later amended complaints, (DEs 28, 33), are struck, and (iii) that Defendant's Motion to Dismiss, (DE 8), is denied as moot. (DE 37 at 7-8).

On August 5, 2020, this Court denied Plaintiff's Motion for Reinstatement of Employment, (DE 40), denied Plaintiff's Motion for Employment Records, (DE 47), denied Plaintiff's Motion to Compel, (DE 53), denied as moot Defendant's Motion for Extension, (DE 54), and granted the Motion to Amend the Pretrial Order and Case Management Plan, (DE 62). (DE 63). Further, on December 16, 2020, this Court granted Defendant's Motion to Compel, (DE 64), and Motion to Compel Mediation, (DE 71). (DE 73). Each of these Orders was appealed to the Fourth Circuit Court of Appeals by Plaintiff. (DEs 66, 76). The Fourth Circuit affirmed this Court's denial of Plaintiff's Motion for Reinstatement of Employment and dismissed the remaining appeals for lack of jurisdiction. (DEs 80, 85).

On May 28, 2021, Defendant filed the instant Motion for Summary Judgement. (DE 89). Plaintiff filed a Response in Opposition on June 29, 2021, over two weeks after the response deadline, without seeking leave or showing good cause for the delay. (DE 91). Defendant timely filed a Reply. (DE 93). Thereafter, Plaintiff filed two additional motions: one to continue discovery and another to continue the trial. (DEs 95, 99).

Plaintiff's two remaining claims both arise from the ADA and include a (1) failure to accommodate claim and a (2) wrongful termination claim. (DE 27). It is on these remaining claims that Defendant seeks summary judgment. (DE 89).

B. **Factual Background**

Read in the light most favorable to the non-moving party. The record establishes the following:

i. <u>Overview</u>

Underdue was employed by Wells Fargo and its predecessors for over fourteen (14) years in the customer service department. (DE 27 at 3). In 1999, she began her banking career with First Union Bank, which was subsequently acquired by Wachovia, and which today is part of Wells Fargo. (*Id.*). Before, during, and after her employment with Wells Fargo, Underdue filed lawsuits against her employer and supervisors. (DE 90 at 1). Her litigious activities began in 2001 against her employer First Union Bank and continue today against her latest employer Wells Fargo. In sum, it includes at least four actions filed in this Court[1], five appeals to the Fourth Circuit, and eight state court complaints—for alleged violations of Title VII for race, sex, age, disability, religious, and retaliatory discrimination; failure to accommodate under the ADA; wrongful termination under the ADA; intentional infliction of emotional distress; negligent supervision of an employee; failure to properly hire, train, and/or supervise subordinates; and tortious interference with contractual rights, among others. Underdue has also sought protective orders against supervisors from having any contact or communications with her at work.

ii. <u>Claimed Disability</u>

In the instant litigation, Underdue made the following disability claim in her Complaint.

Plaintiff . . . suffers from being super, super, super morbidly obese which was brought on by mental and physical disabilities which include a severe recurrent major depressive disorder, borderline personality disorder which is characterized by paranoia and anxiety disorders. The Plaintiff suffers from physical and mental disabilities that cause her to suffer from morbid obesity due to exacerbation of physiological disorders which resulted in substantial limits of her ability to engage in major life activities, such as walking and taking the stairs.

---

[1] *Underdue v. First Charter Bank*, No. 3:01-cv-00261-GCM (W.D.N.C. filed May 18, 2001); *Underdue v. Wells Fargo Bank, N.A. et al.*, No. 3:14-cv-00183-RJC (W.D.N.C. filed April 14, 2014); *Underdue v. Wells Fargo Bank, N.A.*, 3:16-cv-00653-RJC (W.D.N.C. filed Sept. 7, 2016); *Underdue v. Wells Fargo, N.A.*, No. 3:17-cv-00196-RJC (W.D.N.C. filed Apr. 12, 2017).

(DE 27 at 2). Because of her difficulty walking, Underdue has used a handicap parking pass. (DE 91-6). Underdue also claims that she "suffer[ed] from mental breakdowns, including panic and anxiety attacks" because of workplace bullying and that she requested to be transferred out of the department. (*Id.* at 3). However, Underdue notes that she was "performing at or above satisfactory levels" and that "she remained co-operative and performed the requirements of her job without any disciplinary or performance write-ups through the date of her wrongful termination." (*Id.* at 2–3).

Underdue does not allege that she asked Wells Fargo for any type of accommodation for her alleged disabilities, other than continually asking to be transferred to another department. However, Underdue does admit that Wells Fargo accommodated her limited walking ability by approving an earlier working schedule to increase the chances that Underdue would find a handicap parking sport near the building and by seating Underdue near the exit where her car was parked. (DE 91 at 6).

iii. Allegations of Attacks, Direct Harassment, Retaliation, and Intimidation

During her time at Wells Fargo, Underdue worked on multiple different teams within the customer service email department and was directly supervised by Illa Patel, Kendra Brown, and Susan Lybrand. (DE 90-1 at 29:6–12). During the entirely of her employment with Wells Fargo, Brenda Hauk was the manager of the entire department. (DE 90-3 at ¶ 8). During the course of her employment, predominantly in the years leading up to her termination, Underdue accused supervisors and coworkers of "attacks," and "direct harassment, retaliation and intimidation." (DE 27 at 5); (DE 90 at 3). The voluminous complaints levied by Underdue regarding these perceived attacks are as follows.[2]

---

[2] The information about these complaints comes from sworn testimony, predominantly that of Plaintiff Underdue's deposition testimony which is Docket Entry 90-2 ("DE 90-2").

4

On November 18, 2013, Underdue contacted HR to request a transfer to another department and to complain that Brown intentionally delayed her paycheck. (DE 90-2 at 41). HR told Underdue she was welcome to apply for other jobs using the online portal which was the same tool used by all internal employees seeking to transfer to a new job. (*Id.* at 52–53). Regarding the paycheck, Underdue admits it was delayed because she failed to submit her timesheet before the deadline. (*Id.* at 43). Underdue further admits that she has no evidence to demonstrate that Brown "intentionally" interfered with her pay or that her check was delayed due to "discriminatory" actions. (*Id.* at 47, 51). Underdue could only point to an alleged "pattern of behavior" that appears to be predicated on Brown's nature as a stickler for proper timesheets. (*Id.*).

On February 10, 2014, Underdue complained that Patel requested that she complete personal growth training on her own time, out of concern for Underdue staying in the work-space unsupervised. (*Id.* at 54–55, 59, 64, 70, 71). Underdue admits that she has no awareness of any discriminatory intent regarding the supervisor's request. (*Id.* at 71).

On May 1, 2014 and May 9, 2014, Underdue complained that her cell phone number had been given to Wells Fargo's counsel and that she had been advised to only contact said counsel for all employee relations complaints. (*Id.* at 75–76). The Wells Fargo HR team quickly responded to provide clarification that she could still contact HR for employee relations issues, and that the communications with Counsel were for her then-pending lawsuit. (DE 90-3 at 5; DE 90-2 at 76).

In June of 2014, Underdue took issue with the lack of available parental bereavement leave rather than PTO time when her great aunt passed away but admitted that "there was not a discriminatory reason related to [the denial of her bereavement leave]." (DE 90-2 at 94). Later that month, Plaintiff contacted HR again to complain about another delayed paycheck. (*Id.* at 94–

5

95).  While Plaintiff acknowledged that since she failed to submit her timesheet by the deadline there was nothing Brown could have done at that time, in deposition she continued to make statements maintaining that "[Brown] has deliberately caused me financial inconveniences," and "nothing [Hauk] could say that would convince [me] that [Brown] was not unfairly targeting [me]." (*Id.* at 94–95, 104, 107).  She made similar general statements of unwavering suspicion of her other supervisors as well, (*Id.* at 104), and made conclusory statements that "I don't know what motivated [Brown's] actions towards me other than discriminatory reasons." (*Id.* at 107).

In June 2014, Underdue also complained to HR that a co-worker who had been moved closer to her in the office, Tyler Funderburke, was "openly hostile . . . [to] anyone around him." (*Id.* at 108).  Supervisors in the office informed HR that Tyler was simply being moved closer to supervisors so he could be coached on some issues, and that Underdue had no bearing on the move. (DE 90-3 at 6).  Plaintiff acknowledged that she had no facts showing the decision to move Tyler was related to her and recognized that it likely had to do with him getting in trouble and being moved "closer to the teacher's desk." (DE 90-2 at 109).  The incident led Hauk, the department supervisor, to express concerns that Underdue "refuses to believe anything that doesn't prove her point that her supervisor is out to get her." (DE 90-3 at 6).

The next month, in July 2014, Underdue filed an anonymous complaint with the Wells Fargo Ethicsline, claiming that she was "attacked" during a department meeting. (*Id.* at 137–38).  At the meeting in question, Plaintiff complained to coworkers that annual survey evaluations for managers were being manipulated by a "campaign of simply scoring [Brown] all fives." (*Id.* at 121).  Underdue's co-workers were frustrated and expressed concerns to management that, in the meeting, "team members were not given an opportunity to share their positive views of our team and to defend themselves against [Underdue's] allegations that we had somehow falsified scores

to inflate [Brown's] grade." (DE 90-5 at 3–4). After meetings with the team, Wells Fargo HR determined that "there was no evidence to substantiate [Plaintiff's] allegations," that she was "attacked . . . personally, socially, religiously" at the July meetings. (DE 90-3 at 7; DE 90-2 at 143). Underdue sent additional correspondence concerning these meetings and requested a transfer to senior leaders at Wells Fargo, including the CEO, stating that "my peers were used as nails by my leaders to crucify me for comments I had made in a previous meeting, I have become a Stepford Wife by day and a catatonic paralyzed person in the evenings during my quiet time at home." (DE 90-6 at 3).

On September 22, 2014, Underdue contacted HR complaining that her supervisor, Brown, touched her by "put[ing] her arm around my shoulder." (DE 90-2 at 145–46). Underdue admits that she was wearing headphones at the time. (*Id.*). Brown noted in her declaration that she "may have needed to place a hand on her shoulder to let her know that [Brown] was there and needed to speak with her." (DE 90-4 at 4-5). Brown agreed to never touch Underdue again, and Underdue acknowledges that Brown did not touch her again. (*Id.*; DE 90-2 at 149).

Less than a month later, Underdue levied another complaint against a different supervisor, Lybrand, on October 13, 2014. (DE 90-3 at 7–8). Underdue accused her of purposefully lowering Underdue's performance evaluation, but HR determined that Underdue's score was a 3 regardless of whether the evaluation was lowered from 3.45 to 2.95 based on the rounding system used by Wells Fargo. (*Id.*). Underdue admits that "I have no facts it was discriminatory in any way other than that it was hostile. It wasn't done in err . . . it created a hostile work environment and forced me to stay in a hostile work environment." (DE 90-2 at 60).

Two days later, on October 15, 2014, Underdue lodged another complaint against Lybrand, alleging that in 2013 she "bullied" Underdue by removing her from the floor to talk to her when

7

she noticed Underdue was upset. (*Id.* at 163–64). During deposition, Underdue agreed that there is nothing "inappropriate about an employee who is out on the floor crying to pull them off to somewhere private and give them a moment[.]" (*Id.* at 163). Underdue also claimed that Lybrand's actions of engaging Underdue in conversation constituted "stalking." (*Id.* at 164–64). While Underdue acknowledged that it is permissible for a manager to stop and engage with employees, she continued to state that Lybrand's actions were "stalking" or "bullying." (*Id.* at 162–65, 171).

That same day, Underdue called HR to complain that she was not allowed to stay after her shift to apply for other jobs, (*Id.* at 174–75), and stated "I will call HR everyday because everyday at work I have an issue and people are out to get me." (DE 90-3 at 8). HR advised Underdue that her manager was allowed to prevent her from remaining in the work area after her shift. (DE 90-3 at 8). Plaintiff then proceeded to threaten to contact corporate security. (*Id.*)

After another two days, on October 17, 2014, Underdue contacted corporate security to inform them that she was petitioning to get a restraining order on her supervisors and have them charged with Federal Witness Tampering and Intimidation, due to "their efforts to bully me and intimidate me." (DE 90-2 at 177–78). The restraining orders were filed in state court on October 7 of that year, based on stalking or nonconsensual sexual contact. (*Id.* at 185–86). Underdue admitted in deposition testimony that she indeed filed those complaints, and then stated in her next answer that none of those individuals sexually assaulted her. (*Id.*). The stalking claims were mainly based on one occasion when Brown attended the same networking event as the Plaintiff. (*Id.* at 189–91). The complaint was dismissed at a second hearing (after Plaintiff failed to show at the first), and the judge warned Underdue that she could be sanctioned for filing "frivolous" suits and explained that "this was not something used as a tool in an employment dispute." (*Id.* at 85).

8

On October 23, 2014, Plaintiff reforwarded previous messages to Wells Fargo leadership, including the CEO, asking for feedback since she believed that Lybrand's actions (those related to the performance evaluation score changes) were considered a felony, even though she admitted to not knowing the legal standard for a felony. (DE 90-6 at 4; DE 90-2 at 184).

In total, Underdue submitted at minimum "thirteen complaints to HR, two complaints to corporate security, sent two emails raising concerns to senior management, including the CEO, and twice filed state court actions against three supervisors and a co-worker seeking no contact orders." (DE 90 at 11; DE 90-2 at 87). Underdue also accused a supervisor of committing a felony. Wells Fargo's HR department could not substantiate any of the allegations upon investigation of each, a fact which Underdue acknowledges. (DE 90-2 at 180).

### iv. Termination

Underdue was terminated on October 29, 2014, by Wells Fargo for the following reasons stated in a termination letter from Customer Service Manager Jeremy Whicker.

> Over the course of the last year or more, you have made repeated accusations of bullying and harassment against your management team and fellow team members. Not only have these accusations been found to be baseless, exaggerated and blown out of both context and proportion, the allegations lack a reasonable good faith basis that your supervisors or coworkers are treating you unfairly or acting with some ill motive. . . . Your constant complaints have significantly degraded the work environment for both your supervisors and your peers. As a result of your negative impact on the morale and functioning of this work team, and the fact that your meritless allegations continue to needlessly consume unending amounts of management and HR time and attention, we have decided to terminate your employment.

(DE 90-3 at 44).

## II. LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. *Id.* The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal citations omitted). "The burden on the moving party may be discharged by 'showing' . . . an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id.* at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; accord *Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal citations omitted). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Id.* at 249–50.

### III. DISCUSSION

#### A. Count I: Failure to Accommodate under the ADA

10

To survive summary judgment for a failure to accommodate claim under the ADA, the plaintiff must show "(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." *Elledge v. Lowe's Home Centers, LLC*, No. 516-cv-227-RJC-DCK, 2018 WL 6705537, at *6 (W.D.N.C. Dec. 20, 2018) (quoting *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 579 (4th Cir. 2015)).

    i.    <u>Disability</u>

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). A "major life activity" includes "caring for oneself, performing manual tasks, . . . walking, standing, lifting, bending, . . . concentrating, thinking, communicating, and working." *Id.* §12102(2)(A). "[A] person does not qualify as 'disabled' simply by submitting evidence of a medical diagnosis of an impairment." *Lochridge v. City of Winston-Salem*, 388 F. Supp. 2d 618, 626 (M.D.N.C. 2005) (quoting *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002)). "Rather, an individual must offer evidence that the limitation caused by the impairment 'prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives,' and that the impact of the impairment is permanent or long-term." *Id.* "[Obesity] is generally a physical characteristic that qualifies as a physical impairment only if it falls outside the normal range *and* it occurs as the result of a physiological disorder." *See, e.g.*, *Morriss v. BNSF Railway Co.*, 817 F.3d 1104, 1108 (8th Cir. 2016), *cert. denied*, 137 S. Ct. 256 (2016); *EEOC v. Watkins Motor Lines, Inc.*, 463 F.3d 436, 441–43 (6th Cir. 2006); *Francis v. City of Meriden*, 129 F.3d 281, 286–87 (2d Cir. 1997); *Richardson v. Chicago Transit Auth.*, 926 F.3d

11

881, 887 (7th Cir. 2019). Major depressive disorder and anxiety attacks can also constitute a disability should it substantially impair a major life activity. *Doyal v. Oklahoma Heart, Inc.*, 213 F.3d 492, 496–97 (10th Cir. 2000).

Here, there are two potential disabilities that must be evaluated: (i) the physical disability of obesity and (ii) the mental disability of major depressive disorder, personality disorder, and paranoia and anxiety disorder. For either to be a disability, it must substantially limit a "major life activity."

First, taking the facts in a light most favorable to Plaintiff, Underdue's obesity is a disability under the ADA. Underdue notes that she is substantially limited in "walking and taking the stairs" because of her obesity which has required her to use a handicap parking pass. She also states that her obesity is caused by physiological disorders—major depressive disorder, borderline personality disorder, and paranoia and anxiety disorders. Taking these facts in a light most favorable to Plaintiff, Underdue's weight is outside the normal range and was caused by physiological disorders. It also inhibits her walking, which is a major life activity specifically enumerated by statute. Accordingly, for purposes of summary judgment, Underdue's obesity is a disability under the ADA.

Second, Underdue's mental disorders alone are not a disability under the ADA. Underdue suffers from the mental disorders previously discussed. To qualify as a disability under the ADA, a plaintiff's mental disorders must substantially limit a major life activity. 42 U.S.C. § 12102(1)(A) & (2)(A). Here, Underdue asserts in the Complaint that, despite her mental disorders, she was able to "perform[] the requirements of her job" throughout the entirety of her employment. (DE 27 at 2). Underdue also confirmed at her deposition that she was able to perform her job duties and always received satisfactory performance evaluations. (DE 90-2 at 181–82). There are

no facts showing that Underdue's mental disorders substantially impacted any other major life activity.

Moreover, Underdue failed to claim that her mental disorders created any limitations in her ability to perform her job. Rather, the gist of Underdue's complaint and subsequent filings appears to be that she believed certain supervisors were unfairly targeting her and that she "lived in fear of them and it created a certain amount of anxiety coming into work every day." (DE 90-2 at 104–05). "[I]t is well-established that the inability to work with particular co-workers or supervisors does not create a substantial limitation on the major life activity of working." *See Patterson v. McDonald*, 220 F. Supp. 3d 634, 638 (M.D.N.C. 2016) (quoting *Frantz v. Shinseki*, No. 1:10-cv-275, 2012 WL 259980, at *8 (M.D.N.C. Jan. 27, 2012)); *see also Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524–25 (7th Cir. 1996) ("The major life activity of working is not 'substantially limited' if a plaintiff merely cannot work under a certain supervisor because of anxiety and stress."); *Palmer v. Circuit Court of Cook Cty.*, 117 F.3d 351, 352 (7th Cir. 1997) ("[A] personality conflict with a supervisor or coworker does not establish a disability within the meaning of the disability law even if it produces anxiety and depression, as such conflicts often do.") (internal citation omitted). Indeed, this Court has stated that "a personality conflict between an employee and a supervisor—even one that triggers the employee's depression—is not enough to establish that the employee is disabled, so long as the employee could still perform the job under a different supervisor." *Smith v. Charter Communications, Inc.*, No. 3:18-cv-80-MOC-DSC, 2020 WL 3606391, at *7 (W.D.N.C. July 2, 2020) (quoting *Schneiker v. Fortis Ins. Co.*, 200 F.3d 1055, 1062 (7th Cir. 2000)).

Tellingly, at no point before her Response in Opposition to the Summary Judgment Motion does Underdue argue that her mental disorders substantially limited any major life activity. In her

Response, Underdue attempts to manufacture a factual dispute by contradicting her previous testimony, arguing for the first time that she was suffering "declining and failing performance" at work. (DE 91 at 33). However, Underdue's eleventh hour contradictions are insufficient to create a genuine issue of material fact. *See Johnson v. United Parcel Service, Inc.*, 839 Fed. Appx. 781, 784 n. 2 (4th Cir. 2021) (quoting *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999)) ("[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's early sworn deposition) without explaining the contradiction or attempting to resolve the disparity"). Thus, even in a light most favorable to Underdue, Underdue's mental disorders do not substantially limit any major life activities, including working, and as such it is not a disability under the ADA.

        ii.        <u>Notice of Disability</u>

While the burden is not a great one, "an employee must inform the employer of both the existence of the disability and the 'need for the accommodation for that disability.'" *Spivey v. Research Triangle Reg'l Pub. Trans. Auth.*, No. 5:14-cv-44-FL, 2015 WL 5513320, at *12 (E.D.N.C. Aug. 10, 2015). And "the employer must be aware that the alleged disability bears a relationship to the accommodation requested." *Id.* at *14.

Here, Underdue claims she has physical and mental disabilities. As previously discussed, Underdue's only potential disability under the ADA is obesity. Underdue claims that her obesity substantially impairs "walking and taking the stairs." Here, Wells Fargo had notice, as it provided accommodations to Underdue that were directly related to her limited ability to walk and climb stairs.

14

Regarding the mental disorders, even if such disorders were a disability in this case, Wells Fargo was not on notice. "The duty to engage in an interactive process to identify a reasonable accommodation is generally triggered when an employee communicates to his employer his disability and his desire for an accommodation for that disability." *Wilson v. Dollar General Corp.*, 717 F.3d 337, 346-47 (4th Cir. 2013). Here, Underdue, in her Response to Summary Judgement, argues for the first time that Wells Fargo had notice of her mental disorders via emails she sent to a supervisor in 2006 stating that she was "burned out," from medical documentation that she submitted to Wells Fargo for leave requests, and from therapist records she produced during discovery. (DE 91 at 3, 7, 35–36). While these facts are likely insufficient to show that Underdue directly communicated to Wells Fargo that she had mental disorders, there are no facts which show that Underdue asked for an accommodation that was linked to her mental disorders. The only accommodation Underdue asked for was to be transferred to another position. Such a request is insufficient to put an employer on notice of mental disorders.

### iii. Failure to Reasonably Accommodate

A reasonable accommodation is one that (1) "enables [a qualified] individual with a disability . . . to perform the essential functions of [a] position," 29 C.F.R. § 1630.2(o)(1)(ii); or (2) "enable[s] [an] employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by . . . other similarly situated employees without disabilities," *id.* § 1630.2(o)(1)(iii). This standard was further explained by the court in *Bryant*:

> [T]he "reasonable accommodation" question asks whether the accommodation: (1) would be "effective," i.e., would it address the job-related difficulties presented by the employee's disability . . . and (2) would allow the employee to attain an "equal" level of achievement, opportunity and participation, that a non-disabled individual in the same position would be able to achieve.

*Bryant v. Better Bus. Bureau of Greater Maryland, Inc.*, 923 F. Supp. 720, 736 (D. Md. 1996).

15

Here, there are no facts showing that Underdue requested a specific accommodation because of her obesity disability which impacted her ability to walk and take the stairs—other than her request to be transferred to another position which is unrelated. Nonetheless, while it is unclear if Wells Fargo initiated an accommodation on its own for Underdue's obesity, Underdue does admit that Wells Fargo changed her schedule to allow her better chances of finding handicap parking and moved her desk closer to the exit to allow her a shorter walk to her car. (DE 91-6). Thus, Wells Fargo did not fail to accommodate Underdue. In fact, the opposite is true.

Regarding Underdue's mental disorders, even if such disorders were a disability under the ADA, Wells Fargo did not fail to accommodate Underdue. Underdue failed to inform Wells Fargo about her mental disorders and failed to request any accommodation related to her mental disorders. Thus, even if such disorders rose to the level of a disability, Wells Fargo did not fail to accommodate Underdue.

### B. Count II: Wrongful Termination under the ADA

To make a *prima facie* showing of discriminatory termination under the ADA, a plaintiff must show "(1) [s]he was a member of the statutorily-protected class; (2) [s]he was discharged; (3) at the time of [her] discharge, plaintiff was performing [her] job at a level that met [her] employer's legitimate expectations; and (4) [her] discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Propst v. HWS Co., Inc.*, 148 F. Supp. 3d 506, 524 (W.D.N.C. 2015). "If a plaintiff presents sufficient evidence to satisfy the underlying prima facie elements of each of [her] claims, then the burden of production 'shifts' to the employer to offer a legitimate, nondiscriminatory explanation for its decision to terminate." *Id.* 524–25 (citing *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995)). If the employer meets its burden of identifying a legitimate, nondiscriminatory explanation for its action, then to survive summary judgment the plaintiff must show the "legitimate and lawful reasons were

16

merely pretext for unlawful discrimination or retaliation." *Id.* at 527 (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148 (2000)).

As previously discussed, for purposes of summary judgment, Underdue is a member of a protected class regarding her obesity disability, but not for her mental disorders. Regardless, Underdue cannot show that her termination "raised a reasonable inference of unlawful discrimination" based on her obesity or mental disorders. Moreover, even if Underdue could meet this burden, she cannot show that her termination was pretextual.

The facts show that Underdue submitted at minimum "thirteen complaints to HR, two complaints to corporate security, sent two emails raising concerns to senior management, including the CEO, and twice filed state court actions against three supervisors and a co-worker seeking no contact orders." (DE 90 at 11; DE 90-2 at 87). Underdue also accused a supervisor of committing a felony against her. HR reviewed each incident but was unable to substantiate any claim. Underdue has also filed at least four actions in this Court, five appeals to the Fourth Circuit, and eight state court complaints against employers, most, if not all, of which have proven unsuccessful.

Like the HR department and previous courts, after a thorough review of the record, this Court fails to see any facts which show a reasonable inference of wrongdoing on behalf of Defendant. Wells Fargo provided accommodations for Underdue's only disability—obesity—ostensibly on their own accord. And, after years of repeated allegations of "bullying and harassment" that "significantly degraded the work environment," Wells Fargo ultimately decided to terminate Underdue. (DE 90-3 at 44). This justification is unrelated to any disability, nor can Underdue provide evidence of discrimination based on any alleged disability, absent conclusory statements that her supervisors were "out to get [her]." (DE 90-3 at 8). Moreover, "when an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not [the courts]

17

province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998). Accordingly, Underdue fails to make a *prima facie* showing of wrongful termination under the ADA because she cannot show that her "discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Propst*, 148 F. Supp. 3d at 524.

And, even if Underdue could make such a showing, she cannot show that Wells Fargo's legitimate and lawful reasons for terminating her were pretextual. To do so, Underdue "must present some evidence creating a genuine dispute concerning the truth of the Defendants' proffered reason for discharging [her], such that a reasonable trier of fact could find that the 'real reason' underlying Plaintiff's discharge was . . . [her] alleged disability[.]" *Propst*, 148 F. Supp. 3d at 527. "A plaintiff can show pretext by demonstrating that the defendant's explanation is 'unworthy of credence' or by 'offer[ing] other forms of circumstantial evidence sufficiently probative of intentional discrimination.'" *Id.* (quoting *Dugan v. Albemarle Cnty. Sch. Bd.*, 293 F.3d 716, 721 (4th Cir. 2002); *Wright v. N.C. Dep't of Health & Human Servs.*, 405 F. Supp. 2d 631, 636 (E.D.N.C. 2005)). "Mere conjecture and speculation, however, are insufficient to overcome a summary judgment motion." *Id.*

Here, Plaintiff's repeated allegations of bullying and harassment from supervisors and coworkers, which degraded workplace morale, needlessly consumed management and HR resources, and were found to be unsubstantiated, ultimately led Wells Fargo to terminate her employment. Such a decision is well within the lawful discretion of private employers and there are no facts that show any instances of discrimination based on a disability. Therefore, Underdue cannot show that Wells Fargo's lawful and legitimate reasons for terminating her were pretextual.

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1. Defendant's Motion for Summary Judgment, (DE 89), is **GRANTED;**

2. Plaintiff's Motion for Continuance of Discovery, (DE 95), is **DENIED as moot**; and

3. Plaintiff's Motion to Continue Trial, (DE 99), is **DENIED as moot.**

Signed: October 12, 2021

Robert J. Conrad, Jr.
United States District Judge